UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/7/2019

JENAP TURK,

                Plaintiff,

    -against-

GREENBURGH CENTRAL SCHOOL DISTRICT
and TAHIRA DUPREE CHASE,

                Defendants.

No. 16-cv-02075 (NSR)
OPINION and ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Jenap Turk ("Plaintiff" or "Turk") brings this action against his former employer, the Greenburgh Central School District ("GCSD" or the "School District"), and the District's former Superintendent, Tahira Dupree Chase ("Dr. Chase" or "Chase"), alleging employment discrimination based on religion and national origin. See First Amended Complaint, ECF No. 12. Plaintiff alleges two causes of action, namely under 42 U.S.C. §§1981 and 1983, and the New York Human Rights Law ("NYHRL"), New York Exec. Law §296 et seq. Plaintiff alleges: (1) that Defendants violated his Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (First Amended Complaint ¶34), and (2) that the Defendants violated his rights under the NYSHRL.[1] (First Amended Complaint ¶35).

---

[1] To the extent Plaintiff attempted to assert a *Monell* Claim (*Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)), the Court determines Plaintiff's First Amended Complaint, the operative complaint, fails to properly assert such a claim. It is well settled that a municipality may not be held liable under § 1983 solely on a respondeat superior theory. *Monell*, at 691. *Monell* extends liability to a municipal entity for its failure to train, or the policies or customs that it has sanctioned, which led to an independent constitutional violation. *Monell*, at 694. Liability to the municipality is imposed where its policy is "the moving force of the constitutional violation." *Id.* Plaintiff has not alleged any such facts.

To the extent Plaintiff makes reference to the Equal Protection Clause in his operative complaint, he does not assert a claim for disparate impact such that similarly situated non- Muslim or non-Turkish teachers were treated differently. See *Brown v. City of Oneonta*, New York, 221 F.3d 329, 337 (2d Cir. 2000). The only mention of similarly situated individuals can be found in deposition testimony wherein there is a reference to two white female probationary teachers who were being considered for tenure in the Spring of 2014. One was purportedly given tenure. Plaintiff's complaint does not assert sufficient facts to support the elements of such a claim. The Court further notes that the record would not support a finding that the two referenced white female probationary teachers were similarly situated in "all material respects" to Plaintiff. See *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.1997); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Now before the Court is Defendants' motion for summary judgment seeking to dismiss Plaintiff's claims. (Defs.' Mot. for Summ. J., ECF No. 40.) For the reasons that follow, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are derived from the parties' respective Local Rule 56.1 statements, pleadings, and a review of the record.

Plaintiff was born in Turkey and is a Muslim. (Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1") ¶1, ECF 47.) Plaintiff was hired in September 2012 by GCSD as a Middle School and High School teacher of Math and Technology Education. (Pl's 56.1 ¶2) Plaintiff was hired as a probationary teacher and was required to work for two years before he would be eligible for tenure. (*Id.* ¶3) Ronald Ross[2] ("Superintendent Ross" or "Ross") was the Superintendent of Schools for GCSD who recommended that Plaintiff be hired. (*Id.* ¶5)

Superintendent Ross was terminated from his position in September 2014. Dr. Chase was the Assistant Superintendent of GCSD beginning in or about October 2012. Dr. Chase succeeded Ross as the Superintendent of the School District after Ross was terminated. Will Washington ("Principal Washington" or "Washington"[3]) was the Principal of Woodlands High School who recommended to Superintendent Ross that Plaintiff be hired. (*Id.* ¶7) Principal Washington is a Muslim. (*Id.* ¶8). Plaintiff was a member of the Greenburgh Teacher's Federation Union ("GTF"). (*Id.* ¶9) Dr. Joe Foy ("Dr. Foy") and Holly Gant Jones ("Jones") worked as guidance counselors at Woodlands High School and were the union building representatives for GTF. (*Id.* ¶10)

---

[2] It is undisputed that Superintendent Ross was the Superintendent of GCSD until May 2014, when the Board placed Ross on administrative leave. (Pl's 56.1 ¶33.) Ross was terminated from the School District in September 2014. (Pl's 56.1 ¶34.) Superintendent Ross did not recommend Plaintiff for tenure when he was first eligible for it in 2014. (Pl's 56.1¶27.) In the Spring of 2015, when Plaintiff was again a candidate for tenure, Superintendent Ross was no longer with the School District. (Pl's 56.1¶¶ 34,36.)

[3] As noted in this Opinion, Washington was Principal of Woodlands High School until October 2014 when Dr. Chase, for disciplinary reasons, assigned Washington to his home for three months. He was then assigned to an elementary school. (Pl's 56.1 ¶39; Barbieri Decl. Ex H., Dep. Tr. 52:1-25; 53:1-17.) At the time of his deposition, Washington was no longer employed by GCSD.

The Superintendent is required to make a recommendation to the Board of Education (the "Board") for appointment to tenure those certified staff members who successfully complete a probationary period. (*Id.* ¶11) The Board can only approve tenure to a teacher who is recommended by the Superintendent. (*Id.*) Although the Board can question the decision and its basis, the Board has no power or authority to override a Superintendent's recommendation not to tenure a probationary classroom teacher. (*Id.*) Plaintiff first became eligible for tenure at GCSD in Spring 2014. Superintendent Ross did not recommend Plaintiff for tenure. After Plaintiff was denied tenure, he requested that his probationary period be extended for a year.

**Spring 2014 Denial of Tenure**

Plaintiff completed his probationary period and was first considered for tenure in the Spring of 2014. (Declaration of Laura Dawn Barbieri ("Barbieri Decl."), ECF No. 45, Ex. S., at 1). However, after due consideration, Plaintiff was not offered tenure that year.[4] (*Id.*) Defendants submit that Plaintiff was not offered tenure due to his poor classroom management skills and excessive absences. (Second Declaration of James Randazzo ("Randazzo Decl. No. 2"), ECF No. 49, Ex. D., Dep. Tr. 13:12-18; 33:3-11; Ex. E., Dep. Tr. 28:13-17)

Defendants submit Plaintiff took nineteen (19) personal or sick days during his first two years. (First Declaration of James Randazzo ("Randazzo Decl. No.1") Ex. D, at 97-99; Ex. P) Plaintiff does not dispute the absences but indicates that a portion were excusable. Plaintiff asserts that he took 14.25 sick days and 3.5 personal days, a total of 17.75 days off, submitting his attendance record as evidence. (Barbieri Decl. Ex. Q, at 1) Plaintiff contends that proctoring (.5 day), jury duty (1 day) and a school meeting (.5 day) do not count towards sick days. (Pl's 56.1 ¶ 22.1). Additionally, Plaintiff submits two medical notes for illnesses he

---

[4] Defendants submits separate letters to the Plaintiff from Principal Washington and Superintendent Ross, which state that the Plaintiff would not receive a recommendation for tenure. (Randazzo Decl. Ex. Q ("March 18, 2014 letter"), at 2, Randazzo Decl. Ex. R ("April 30, 2014 letter"), at 2.) The letters, however, are sparse and do not evince any motives on the part of either administrator. Rather, they simply tell the Plaintiff that he would not be recommended for tenure. Plaintiff also submits email letters indicating that he was not recommended for tenure. In an April 4, 2014 email, Dawn Johnson, the Director of Human Resources, wrote that at the School Board's "Work Session" on April 1, 2014, it was determined Turk would not be recommended for tenure. The email was then forwarded from Superintendent Ross to Dr. Chase. (Barbieri Decl. Ex. T ("Email exchanges dated April 4, 2014"), at 2-3)

suffered during the 2013-2104 school year, which led to absences, and that said absences are deemed excused absences, such that they should not have been held against him.[5] (Barbieri Decl. Ex. R and Ex. I).

Defendants contend that Plaintiff was aware that the School District had a concern about his attendance and classroom management skills, and that Plaintiff spoke with Dr. Foy about those concerns. (Randazzo Decl. No.1 Ex. G, Dep. Tr. 26-46.) In his deposition, Principal Washington testified that he did not recommend Plaintiff for tenure in 2014 because of excessive absences. (Randazzo Decl. No. 2 Ex. A, Dep. Tr. 21: 21-25- 22: 1-7.) Plaintiff was among three teachers that Washington did not recommend for tenure that year. (Barbieri Decl. Ex. S at 1.) Principal Washington stated he did not recommend the three teachers - Plaintiff , Chaz Bussittil ("Bussittil") and Heather Rocker ("Rocker") - because they had attendance problems. (Randazzo Decl. Ex. A, Dep. Tr. 21:21-25- 22:1-7). Superintendent Ross, who purportedly made the decision not to grant tenure, relied on Principal Washington's recommendation, when he reported to the School District's Board of Education that Plaintiff would not be offered tenure. (Randazzo Decl. No. 1 Ex. E, at Dep. Tr. 9:1-10; 16-17, 24-25, 30).

Plaintiff submits that attendance and classroom management problems are a pretext for the discrimination he suffered. He asserts that nowhere in the GCSD's personnel policies, the District's Annual Professional Performance Review ("APPR"), or the GTF contractual agreement is attendance a relevant factor in making tenure decisions. (Pl's 56.1 ¶12.1). However, a review of the state laws, regulations and school district policies for evaluating teachers, including probationary teachers, indicates otherwise. (Randazzo No. 1 Ex. I). Sixty (60) percent of a teacher's evaluation consists of "other measures of teacher effectiveness consistent with standards prescribed by the Commissioner in regulation." New York Educ. Law §3012-c, 2.h. In addition, the APPR ratings includes teacher attendance as a factor. New York Educ. Law §3012-c, 2.h(5)(ii) ("Any other goals shall address quantifiable and verifiable improvements in the academic results or the school's learning environment …"). Plaintiff submits that despite the regulations and policies,

---

[5] Contained within the record documents is letter, dated April 3, 2014, from a union representative addressed to GCSD indicating that six of Plaintiff's absences were excused for illness. (Randazzo Decl. No.1 Ex. X, at 2).

the Board discounted attendance and was primarily concerned with whether the teacher was an effective teacher. In support of its proposition, Plaintiff relies on the testimony of Matthew Smith ("Principal Smith" or "Smith"), who served as the interim principal at the school. A review of Smith's deposition does not support Plaintiff's contention. Principal Smith testified that attendance, along with a teacher's ability to teach and manage a classroom, the "totality" of the circumstances, were relevant factors in determining whether to recommend and or grant tenure to a probationary teacher. (Barbieri Decl. No. 1, Ex. L, 26: 13-24; 67:7-10.) Principal Smith also testified that he valued a teacher's ability to manage a classroom because student safety was important. (*Id.* at 67: 22-25). Smith added that Plaintiff lacked classroom management skills. (*Id.*)

In further support that attendance was not a relevant factor in determining whether to grant tenure, Plaintiff asserts that two "American" teachers, Rocker and Busuttil, who had terrible attendance records, were approved by Ross and the Board for tenure. A review of Rocker's attendance records shows she had a significant number of absences. Plaintiff did not proffer Busuttil's records. Additionally, the record reveals that at a Board session of April 1, 2014, Ross recommended that Rocker and Busuttil be recommended for tenure. (Barbieri Decl. No.1, Ex. T).

Plaintiff contends Superintendent Ross decided not to grant him tenure because of his religion and nationality (Randazzo Decl. No. 2 Ex. A, Dep. Tr. 47:13-17-48: 3-5). Plaintiff testified that Washington informed him that Superintendent Ross said on several occasions that he would never give Muslims tenure because they would "come back and blow up the school."[6] (Barbieri Decl. Ex. B, at 94:1-25). A review of the proffered record does not support Plaintiff's testimony. Nowhere in his deposition did Washington testify about Muslims and bombs. In his deposition, Principal Washington, however, did testified that Superintendent Ross did not approve Plaintiff for tenure because he was a Muslim and there were concerns about Muslims. (*Id.* at Ex. H, 35:2-9.) Principal Washington also testified that at multiple meetings,

---

[6] Such statement is hearsay and of no evidentiary value. Hearsay is defined as an out of court statement offered in evidence to prove the truth of the matter asserted in the statement. Fed. R. Ev*Id.* 801(c).

Superintendent Ross made jokes about Plaintiff because of his name, a "Turk being from Turkey." (*Id.* at Ex. H, 59: 22-25; 60:2).

Ross testified that as Superintendent of GCSD he was responsible for all personnel decisions, including whether to grant tenure to probationary teachers. (Barbieri Decl. No. 1 Ex. E, at 7:16-25.) Ross' decisions were subject to school board approval. (*Id.* at 15: 18). When determining whether to grant tenure, Ross relied on the school's principal recommendation. Therefore, in regards to the high school, Ross relied on Principal Washington. (*Id.* at 9: 2-10). Ross testified that in the Spring of 2014, he decided not to grant tenure to Plaintiff based on Principal Washington's recommendation. (*Id.* at 10: 10-20). Although he could not remember the specific reasons for denying tenure, he testified that he and Washington discussed Plaintiff's attendance, and personnel record. (*Id.*). Attendance was an important factor for Ross as well as for members of the school board. (*Id.* at 11:2, 11-25). If a teacher had poor attendance, it "would have been a red flag." (*Id.* at 23: 4-8).

Ross testified that he had no recollection of having met Plaintiff but it was very likely that he did. (*Id.* at 9: 12-16). Despite Principal Washington's assertion to the contrary, Ross claims he never made any derogatory statements about Muslims and denied stating that he would not grant tenure to Muslims. (*Id.* at 20:5). In determining whether to grant tenure, neither religion nor nationality were factors. (*Id.* at 20:7-12). Ross also testified that he was unaware that Plaintiff was from Turkey. (*Id.* at 20:15-19). He did not recall discussing Plaintiff's nationality and even if he did, it was not a factor. (*Id.*). During his deposition, Ross reviewed Plaintiff's attendance record and indicated that his attendance would have given him a reason to "hesitate." (*Id.* at 23:4-8). Moreover, he would have relied on what the principal had to say. (*Id.*).

Plaintiff recalls meeting Superintendent Ross but never interacted with him. (Randazzo Decl. No. 1, Ex.C, Dep. Tr. 43:12-20). Plaintiff never discussed tenure with Superintendent Ross. Nor is there evidence in the record to indicate Plaintiff ever heard Superintendent Ross say anything derogatory against him, Muslims or anyone from Turkey.

Dr. Chase testified that the school superintendent makes all personnel decisions. (Barbieri Decl. N0. 1, Ex F, Dep. Tr. 39: 10-21). The school board may question the superintendent's decision but she has the "exclusive decision making authority" on personnel matters. (*Id.*). As it relates to tenure, the board may only approve or disapprove those candidates who are eligible for tenure and who have been recommended by the superintendent. (*Id.* at 40:6-15). If the superintendent does not recommend a probationary teacher for tenure or, better said, does not present the teacher to the board for a vote, the board does not have the ability to question or overturn the superintendent's decision. (*Id.*)

Defendants submit that Dr. Chase was not involved in or have any input into the decision not to grant Plaintiff tenure in 2014. (Randazzo Decl. No. 1 Ex. D, Dep. Tr. 44; 117). Washington testified that Dr. Chase was present at multiple meetings wherein Plaintiff's tenure was discussed, including at a Board working committee meeting. (Barbieri Decl. No.1, Ex. H, Dep. Tr. 24-25). Dr. Chase does not dispute that she was present when Superintendent Ross made his recommendation to the Board. (Randazzo Decl. No. 1 Ex. D, Dep. Tr. 43: 1-5). Though Washington testified that then-Assistant Superintendent Chase worked "hand-in-glove" with then-Superintendent Ross, there is no evidence in the record that Chase was directly involved in the decision to deny tenure to Plaintiff in 2014. (Barbieri Decl. No.1, Ex H, Dep. Tr. 34:12-25; 1-9). Washington also testified that Dr. Chase was present when Superintendent Ross stated, "I don't tenure Muslims." (*Id.* at Tr. 50:7-15). Washington did not give particular dates for when Superintendent Ross made the derogatory statements. Washington, however, did testify that when Superintendent Ross made such remarks, Dr. Chase would either not object or would only comment, "[w]e know he's crazy, you know how he is." (*Id.* at Tr. 51:1-3).

The Board, along with Superintendent Ross and Dr. Chase, discussed Plaintiff's tenure in a closed session meeting. Dr. Chase did not recall if she made any comments during the closed session and there are no minutes memorializing what was discussed. (Randazzo Decl. No. 1 Ex. D, Dep. Tr. 43: 11-14). Dr. Chase also testified that she did not recall whether she was consulted about the Plaintiff's candidacy for tenure. (Randazzo Decl. No. 1 Ex. D, Dep. Tr. 44:15-21).

**Plaintiff's Evaluations**

Plaintiff further submits letters of his formal and informal evaluations from the School District as evidence that his performance as a teacher was not lacking. On September 21, 2012, Assistant Principal Frank Gluberman ("Gluberman") conducted an informal classroom evaluation of Plaintiff. (Barbieri Decl. No. 1, Ex. J). As documented by his memo, Gluberman observed "major problems" which needed to be addressed before Principal Washington made a formal observation. (*Id.*). Gluberman noted students arrived late to class, the smart board was not ready to be used, student were engaged in their own conversations, students were texting instead of using their phones as calculators, student were not taking notes, students appeared not to be grasping the material, and no effort was made to capture the students' attention. (*Id.*) It was strongly suggested that Plaintiff observe another teacher's class, establish classroom routines and develop teaching strategies. (*Id.*). Gluberman also noted if it had been a formal observation, it would have been "unsatisfactory." (*Id.*).

On Oct. 18, 2012, Gluberman conducted another informal observation, "a walk through" of Plaintiff's class. (*Id.*). Gluberman observed students actively engaged, asking questions, and helping each other. (*Id.*). Gluberman noted "[i]It is through [Plaintiff's]… teaching and involvement with the students that has led to a conducive atmosphere which is apparent in this class … A job well done!"(*Id.*). The document also stated that per the teacher's contract, the informal observation could serve as a formal and official observation by mutual agreement. (*Id.*). Both Plaintiff and Gluberman executed the document making it a "formal and official observation." (*Id.*).

On December 5, 2012, Gluberman conducted a formal observation of Plaintiff. (*Id.*). Gluberman noted that positive student energy was encouraged and well managed, Plaintiff utilized various teaching techniques to monitor and deliver the lesson, the lesson plan appeared to be well prepared, the smartboard was properly used, Plaintiff provided positive feedback to the students, and students maintained interest. (*Id.*). Overall, Plaintiff received a "Satisfactory" rating. (*Id.*) .

On December 4, 2013, Principal Washington conducted an evaluation of Plaintiff's business class giving Plaintiff an overall rating of "Effective." (Barbieri Decl. No.1, Ex. K). Washington noted that Plaintiff provided clear explanations and directions for the students, the lesson was replete with engaging activities, and Plaintiff provided assignments that were geared towards the learning objectives. (*Id.*). In areas for growth, Washington indicated that Plaintiff should select engaging and high interest topics for lessons. (*Id.*).

On a March 2014 evaluation of Plaintiff's movie production class, conducted by Patricia Simone ("Simone"), [7] Plaintiff received an overall "Effective" rating. (Randazzo Decl. No. 1, Ex. O). Simone noted that Plaintiff had a well prepared lesson, and kept the students on task, engaged and focused. (*Id.*). Though Simone noted several area's for growth, none were significant. (*Id.*).

On a November 2014 evaluation of Plaintiff's Introduction to Mobile Hardware class, conducted by Marguerite Clarkson ('Clarkson")[8], the Assistant Superintendent for Curriculum and Instruction, Plaintiff received ratings of "Highly Effective" and "Effective." (Barbieri Decl. No.1, Ex. N). Clarkson noted that the "lesson was well planned, timed and organized in a traditional manner while using new technology." (*Id.*). Clarkson also noted that Plaintiff demonstrated that he was "an expert in the field of technology who knows the level of proficiency necessary to succeed in the 21st Century workplace." (*Id.*). Clarkson also noted that the lesson seemed introductory and a merely review of information previously covered. (*Id.*) She suggested that Plaintiff should consider ways to move the curriculum forward at a faster pace allowing high achievers to move ahead. (*Id.*).

Principal Smith testified that he conducted several informal observations of Plaintiff's class. (Barbieri Decl. No.1, Ex. L, Dep. Tr. 19:19-20). An informal observation consisted of an unannounced visit to a class and observing the teacher for fifteen to twenty minutes. (*Id.* at 20: 8-20). Principal Smith recalled conducting approximately six informal observations of Plaintiff. The first occurred in February 2015. (*Id.* at 21:2-4). Principal Smith testified that he observed that Plaintiff did not have a lesson plan on the board, there were

[7] Simone was a teacher evaluator at the high school.
[8] Clarkson was a teacher evaluator at the high school.

students in the classroom who were not part of the class, students were unengaged, some students were sleeping or lounging, and others were on their cell phone. (*Id.* at 21: 10-20).

Principal Smith discussed his observations with Plaintiff (*Id.* at 21: 23-24). Smith also had meetings with Plaintiff and Dr. Foy concerning his classroom observations. (*Id.* at 22: 11-20.; 21: 21-25; 22: 2-22). Principal Smith testified that on at least two occasions he wrote letters memorializing his observations which were intended to be placed in Plaintiff's file. (*Id.* at 23: 2-3). However, after discussions with Dr. Foy, Smith was persuaded not to place the letters in Plaintiff's personnel folder and merely issued the letters to Plaintiff. (*Id.* at 23: 13-22). Principal Smith referred to the letters as counseling letters. (*Id.* at 24: 11-13). The counseling letters concerned Plaintiff's handling of the classroom and his attendance. (*Id.* at 25: 14-24). Smith did not maintain a copy of the letters he provided to Plaintiff. (*Id.* at 26: 7-10). Principal Smith testified that he was aware of a formal observation conducted by Clarkson (*Id.* at 27: 9-16) and that Dr. Chase conducted multiple informal classroom observations of Plaintiff. (*Id.* at 29: 7-11).

Dr. Foy testified that as a union representative he attended several meetings with Plaintiff and school administrators following observations of his class. (Barbieri Decl. Ex. K., Dep. Tr. 56:3-15). Dr. Foy believed he attended more than three meetings concerning Plaintiff. (*Id.* at 83: 11-22). Dr. Foy testified that there were additional meeting held where other union representatives attended on behalf of Plaintiff. (*Id.* at 85 16:25). On more than one occasion, Dr. Foy asked Principal Smith not to include negative evaluations in Plaintiff's personnel folder in order to afford Plaintiff an opportunity to address his deficiency. (*Id.*). As a union representative, it was standard practice to ask an administrator not to file a negative evaluation in a teacher's personnel folder. (*Id.* at 82: 4-16). Topics discussed at the meetings included students in the classroom which were not part of the class, students reporting they were mis-graded, and a student smoking marijuana outside who was supposed to be in class. (*Id.* at 56: 16-25; 57: 2-14). Dr. Foy also recalls Plaintiff's attendance record being discussed. (*Id.* at 58:23-25).

**Post Spring 2014**

Plaintiff received notice from the school district that he was not granted tenure on April 30, 2014. (Randazzo Decl. No. 1 Ex. R, at 2). Plaintiff requested that that the Board extend his probationary period an extra year, which was approved. (Randazzo Decl. No. 1 Ex. T., at 2). Meanwhile, in May 2014, the Board placed Superintendent Ross on administrative leave. ((Pl's 56.1 ¶33.) Dr. Chase was appointed Acting Superintendent of GSCD. (*Id.* ¶36.) As Acting Superintendent, Dr. Chase recommended to the Board that Plaintiff's request to extend his probationary period be approved. (Randazzo Decl. No. 1, Ex. D, Dep. Tr. at 105-106; Ex. T).

The School Board brought charges against Superintendent Ross in a disciplinary proceeding pursuant to New York Education Law § 3020-a ("Section 3020-a").[9] (Randazzo Decl. No. 1 Ex. E., Dep. Tr. 38:1-25). Superintendent Ross was placed on administrative leave pending the disciplinary charges. Superintendent Ross was charged with and found guilty of, *inter alia*, failing to report a suspected case of child abuse. (*Id.* at 38:2-8). Defendants concede there were other proceedings commenced against the School Board and Ross, including the Section 3020-a proceeding, but they assert that the proceedings have no relevance to Plaintiff's case. (Defendant's Response to Plaintiff's Rule 56.1, ("Def. Resp.") at 12). The Defendant further contend that the record does not demonstrate that the Section 3020-a proceedings against Superintendent Ross was related to any claims of discrimination. (Def. Response ¶35.2.)[10] Though Principal Washington testified that he, his wife and several other employees, who were Muslims, sued the School Board and Superintendent Ross for alleged religious discrimination (Barbieri Decl. Ex. H. 37:4-24), there is no evidence in the record presented that the Section 3020-a proceeding was related to any claim of discrimination.

---

[9] NY Social Services Law § 415 requires all mandated reporters, including teachers, to make an oral report of suspected child abuse or maltreatment immediately and to file a written report within 48 hours. See *Kimberly S.M. by Mariann D.M. v. Bradford Cent. Sch.*, 226 A.D.2d 85, 89, 649 N.Y.S.2d 588, 591 (1996)

[10] Defendants are correct that the record fails to make clear that Ross was charged with discriminatory behavior in the §3020 proceeding. On the other hand, Defendants admit that the District received complaints against Ross concerning statements he allegedly made in the past. (Def. Response ¶34.1). Defendant further admits that the Board did not investigate Ross' decisions for "potential discrimination." (Def. Response ¶34.2).

Dr. Chase was appointed interim Superintendent in September 2014. (Pl's. 56.1 ¶36). In October 2014, Dr. Chase suspended Principal Washington for three months before he was re-assigned to an elementary school as an Assistant Principal. (Pl's 56.1 ¶39). Washington was suspended by Dr. Chase for alleged misconduct and subsequently terminated in March 2015. (Barbieri Decl. Ex H., 52:1-25; 53:1-17).

Smith was appointed Interim Principal of Woodlands High School after Washington's suspension and in February 2015 was hired as the Principal. (Pl's 56.1 ¶40). Principal Smith testified that he did not recommend Plaintiff for tenure in 2015 because of classroom mismanagement, attendance issues, and a lack of follow through.[11] (Randazzo Decl. No. 1 Ex. H, Dep. Tr. 31:14-16). Plaintiff purportedly allowed students who did not belong in his class to hang out in the classroom and failed to notify parents, guidance counselors and the administration when students did not attend his class. (Randazzo Decl. No.1 Ex. G, Dep. Tr. 26-46). Principal Smith testified that he provided Plaintiff with classroom strategies in order to improve but Plaintiff failed to follow them. (Randazzo Decl. No. 1 Ex. H., Dep. Tr. 55:2-7).

**Spring 2015 Denial of Tenure**

The Defendants claim that based on Principal Smith's recommendation, Plaintiff's attendance, and her own observations, Dr. Chase did not recommend to the Board that Plaintiff be granted tenure. (*Id*. at 66: 8-24). Dr. Chase testified that when the School Board asked about Plaintiff's tenure following his second year, she recommended that Plaintiff be assigned a mentor and that he be provided with professional development in the area of classroom management. (Barbieri Decl. Ex. F., Dep. Tr. 107:24-25; 108:1-6). Rocco Varuolo ("Varuolo") was assigned as Plaintiff's mentor and the secondary coach of the school's robotics team. (*Id*. Ex. U, Depo. Tr. 34: 4-16, 22: 5-6). Plaintiff was assigned to serve as the primary coach of the school's

---

[11] He testified that the reasons he did not recommend Plaintiff for tenure in 2015 were inadequate "classroom management, his attendance, lack of follow through. When I say follow through I'm referring to the robotics competition. I'm referring to when he became the key club advisor, there were several times where I had to ensure that he was providing for a blood drive and for the key club to volunteer to the community. So there was several instances where it was just a matter of following through." (Randazzo Reply Ex. D, Dep. Tr. 31:14-25).

robotics team. (*Id.* 22: 2-4). Varuolo testified that he understood that Plaintiff was asked to start a "Lego team," with the goal of having it compete but he failed to do so.[12] (*Id.* at 22: 10-18).

Dr. Chase also testified that Plaintiff was given the assignment of leading the school's robotics team and that the "assignment failed [so] miserably," that his "mentor [Varuolo] had to take over the club." (*Id.* Ex. F, Dep. Tr. 108: 2-13). Dr. Chase testified that she and Principal Smith visited Plaintiff's classroom and found the classroom to be a "mess." (*Id.* at 123: 4-6). Dr. Chase, however, could not remember the date of the visit and she did not take any contemporaneous notes of her informal visit. (*Id.* 127: 1-6).

Dr. Chase testified that she never heard Superintendent Ross make comments with respect to Muslims. (Randazzo Decl. No.1, Ex. D, Dep. Tr. 103:21-23; 104: 2). She also testified that the first time she learned that Plaintiff was Turkish was when he filed an EEOC complaint against her. (*Id.* 105:15-21). In April 2015, Dr. Chase wrote Plaintiff a letter letting him know that she would not be recommending him for tenure. (Randazzo Decl. No.1, Ex. V). Dr. Chase decided not to grant Plaintiff tenure based on Principal Smith's recommendation. (*Id.* at Ex. D, Dep. Tr 108: 2-13). In addition, Dr. Chase relied on her own informal observations of Plaintiff and his failure with the robotics team. (*Id.*). On May 21, 2015, the School District informed Plaintiff that the School Board reviewed Dr. Chase's recommendation and determined not to offer Plaintiff tenure at the end of his probationary period, which was August 31, 2015. (Randazzo Decl. No.1 Ex. W).

## LEGAL STANDARD

**Summary Judgment**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations" (*Id.* at 56(c)(1)(A)), "which it believes demonstrate[s] the absence of a genuine

---

[12] It's unclear from the record whether the Robotics and Lego team are one in the same.

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence [in] support" of such a contention. Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted).

If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a motion for summary judgment should fail. *Id.* at 248; accord *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summ. order). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. If the Court finds that one party to a case has "no real support for its version of the facts," a motion for summary judgment should be granted. *Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir. 1962). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 106 S.Ct. 2505 (1986); *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013).

## 42 U.S.C. § 1981

Section 1981, originally § 1 of the Civil Rights Act of 1866, 14 Stat. 27, protects the equal right of "[a]ll persons within the jurisdiction of the United States" to "make and enforce contracts" without respect to race. 42 U.S.C. § 1981(a). The statute defines "make and enforce contracts" to "includ[e] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b); *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006). Section 1981 provides a cause of action for all race-based employment discrimination including those based based on a hostile work environment.[13] See *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987). A claim of discrimination under Section 1981 requires a showing of intentional discrimination. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982).

## 42 U.S.C. § 1983

42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

---

[13] Plaintiff does not assert a claim for hostile work environment in his operative complaint. Further, a review of the record reveals there is insufficient evidence to support such a claim. A hostile working environment exists where incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive. *Lopez*, at 1189 (internal citation omitted). A plaintiff asserting a Section 1981 claim must demonstrate a specific instance of racial discrimination and some affirmative link to causally connect the actor with the discriminatory act(s). *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 206, 229 (2d Cir. 2004). In order to withstand a summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.* at 69 quoting *Cruz v. Coach Stores, Inc*., 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks omitted). The mere utterance of a racial epithet which engenders offensive feelings in an employee may not suffice to affect the conditions of employment to support such a claim. See *Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21 (1993) (internal citations omitted). For racist comments, slurs, and jokes to constitute a hostile work environment, there must be "more than a few isolated incidents of racial enmity," *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) quoting *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986). Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute. *Snell* at 1103 citing *Cariddi v. Kansas City Chiefs Football Club, Inc*., 568 F.2d 87, 88 (8th Cir.1977).

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); see *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). "In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free School Dist.*, 365 F.2d 107, 122 (2d. Cir. 2004.) Additionally, "[i]n this Circuit personal involvement of defendants in the alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977); *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir.2001); *Fiengold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004).

**Equal Protection under the 14th Amendment**

Traditionally, the Equal Protection Clause of the Fourteenth Amendment protects against [classification-based] discrimination." *Goldfarb v. Town of West Hartford*, 474 F.Supp.2d 356, 366 (D.Conn.2007) (internal quotation marks omitted). The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Generally, to maintain an equal protection claim, a plaintiff must "show adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person*." Terrill v. Windham-Ashland-Jewett Cent. Sch. Dist.*, 176 F. Supp. 3d 101, 110 (N.D.N.Y. 2016) quoting *Miner v. Clinton Cty*., 541 F.3d 464, 474 (2d Cir. 2008) (internal citations omitted).

To demonstrate that he was subject to disparate treatment, a Plaintiff must show that he was treated "less favorably" than a similarly situated employee outside his protected group." *Graham v. Long Island R.R*., 230 F.3d. 39 (2d. Cir. 2000). In *Graham*, the Court of Appeals elaborated on what "similarly situated" means. A plaintiff must demonstrate that he was similarly-situated in "all material

respects" to the individuals with whom he is comparing himself. *Id.* A plaintiff also must show that his co-employees were subject to the same performance evaluation and discipline standards and that the conduct for which the employer imposed discipline was of comparable seriousness. *Id.* at 40. (internal citations omitted).

**Employment Discrimination**

Similar to Title VII, a Section 1983 claim alleging employment discrimination based on race, religion or national origin is governed at the summary judgment stage by the analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); see also *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d. Cir. 2004); *Tolbert v. Smith,* 790 F.3d 427, 436 (2015) (describing the four elements of a discrimination claim under *McDonnell Douglas*). Under the *McDonnell Douglas* framework, to establish a prima facie case of discrimination a plaintiff must demonstrate that (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 & n. 6 (1981); *Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir. 1991); *Chambers v. TRM Copy Centers Corp*., 43 F.3d 29, 37 (2d Cir. 1994); *Stern v. Trustees of Columbia Univ*., 131 F.3d 305, 311-12 (2d. Cir. 1997). "The requirements are neither onerous nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson,* at 467 (internal citations and quotation marks omitted). To meet this burden, the plaintiff may rely on direct, as well as circumstantial evidence. See *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99–101 (2003).

If the plaintiff establishes a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." *Stratton v. Dep't for the Aging for N.Y.C.*, 132 F.3d 869, 879 (2d Cir. 1997); see also *Reeves v. Sanderson Plumbing Prods. Inc*., 530 U.S. 133, 142–43 (2000). "The purpose of this step is to force the defendant to give an explanation for its conduct, in order to prevent employers from

simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Stratton*, 132 F.3d at 879 (internal citations omitted). If the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993); see also *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). Once the employer has offered a legitimate, non-discriminatory reason for the adverse employment action, the burden falls on the plaintiff to show that it is more likely than not that the reason offered is mere pretext and the real reason for his termination was national origin and religion. *Ruiz v. County of Rockland*, 609, F.3d 486, 492 (2d Cir. 2010). Stated differently, to defeat a defendant's properly supported motion for summary judgment, a plaintiff must show that there is a material issue of fact as to whether the employer's asserted reason for discharge is false or unworthy of belief and more likely than not the employee race, religion or national origin was the real reason for the discharge. See *Hicks*, 509 U.S. 502; *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1225 (2d Cir. 1994). Typically, the "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment action was motivated, at least in part, by an "impermissible reason," i.e., that there was discriminatory intent. *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilitie*s, 115 F.3d 116, 119 (2d Cir. 1997).

**NYHRL**

NYHRL claims of discrimination are evaluated using the same analytical framework established by *McDonnell-Douglas*. See *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010); *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 466 (2d Cir. 2001). To establish a prima facie case within that framework, as previously discussed, a plaintiff must proffer evidence (1) that he is a member of a protected class, (2) that he is qualified for the position at issue, (3) that he was subject to a materially adverse employment action, and (4) that the circumstances give rise to an inference of invidious discrimination. *McDonnell Douglas*, 411 U.S. at 802. Under the NYHRL, liability for

employment discrimination may be imposed on individuals. *Lore v. City of Syracuse*, 670 F.3d at 169.

Unlike federal law claims, state law claims of discrimination under NYHRL asserted against a state

entity require a Plaintiff to comply with notice of claim as set out in New York County Law § 52. See

*Russell v. Westchester Cmty. Coll.*, No. 16-CV-1712, 2017 WL 4326545, at *6 (S.D.N.Y. Sept. 27,

2017) (not only are the notice requirements of New York Gen. Mun. Law § 50-e applicable to claims

brought pursuant to New York Executive Law § 296, but also the broader notice requirements of New

York County Law § 52 are also applicable).

**QUALIFIED IMMUNITY**

"Qualified immunity shields government officials from liability for civil damages as a result of

their performance of discretionary functions, and serves to protect government officials from the

burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995).

Government actors performing discretionary functions are "shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The immunity protects a government actor if it was "objectively reasonable" for him to believe that his

actions were lawful at the time of the challenged act." *Id.* (quoting *Anderson v. Creighton*, 483 U.S.

635, 641 (1987)). "The objective reasonableness test is met—and the defendant is entitled to

immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's

actions." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 340-41 (1986)).

**DISCUSSION**

Plaintiff asserts that he was discriminated against based on his religion and national origin.

Defendants do not dispute that Plaintiff can the establish the first three elements of a claim of discrimination.

They concede that Plaintiff is a member of a protected class. (See Memorandum of Law in Support of

Defendant's Motion for Summary Judgment ("Def. Mem. of Law"). Plaintiff is a person of Turkish descent

and a Muslim. Plaintiff is also qualified for the position of teacher because he possesses the basic skills to

teach. See *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d. Cir. 1978), cert. denied, 439 US 984 (1978). Defendants do not dispute they are state actors and that they were acting under the color of state law. The School District is an entity of the state[14] and Dr. Chase, as Assistant Superintendent and later as Superintendent, was an employee of the School District. "[S]tate employment is generally sufficient to render the defendant a state actor." *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 935 n. 18 (1982). Moreover, the parties do not contest that Plaintiff suffered an adverse action. An adverse action is defined as a materially adverse change in the terms and conditions of employment. *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015) (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir.2006)) (internal citation and quotation marks omitted). An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. *Id.* The denial of tenure to a probationary employee has been deemed to constitute an adverse action (see *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015); *Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 148 (D. Conn. 2012); *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 315 (E.D.N.Y. 2014)), as well as termination from one's employment. See *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004).

The relevant inquiry for the Court is whether Plaintiff can establish an inference of discrimination with respect to the two adverse employment actions: the 2014 denial of tenure; and the 2015 denial of tenure which resulted in the termination of his employment. Defendants contend even if there is evidence of discrimination, Plaintiff was not offered tenured and was ultimately terminated for legitimate non-discriminatory reasons. Specifically, Defendants assert Plaintiff was denied tenure and subsequently terminated due to poor attendance and lack of adequate classroom management skills. According to the Defendants, a legitimate non-discriminatory reason is a complete defense.

---

[14] New York Courts have held that School Districts and School Boards are entities of the State. See, e.g., *City of New York v. State of New York*, 86 N.Y.2d 286, 289 (1995).

**The 2014 Tenure Decision**

With regards to the denial of tenure in the Spring of 2014, there is a material issue of fact which warrants denial of the motion as against GCSD. A review of the record reveals that Plaintiff had questionable classroom management skills and mixed performance evaluations. The informal evaluations indicate Plaintiff was lacking in basic teaching skills but the formal evaluations show Plaintiff was at the very least "Satisfactory." This disconnect between Plaintiff's documented positive or satisfactory evaluations and Defendant's proffered evidence of poor class room management skills and bad attendance, presents a material dispute of fact warranting a denial of summary judgment. Moreover, the documentary evidence of Plaintiff's positive performance reviews may suggest that Defendants' proffered reason for denying him tenure is pre-textual.

The record also supports a finding that Plaintiff had excessive absences.[15] While a lack of or inadequate classroom management skills and excessively absences constitute legitimate non-discriminatory reason(s) to justify an employer's adverse employment act, Plaintiff has proffered sufficient evidence, be it razor thin, of discriminatory intent for his denial of tenure. Former Principal Washington testified that he recommended to Superintendent Ross that Plaintiff not be granted tenure due to his absences. Washington also testified that Superintendent Ross made discriminatory remarks about Muslims and that he would never give a Muslim probationary teacher tenure. Superintendent Ross also referred to Plaintiff as "Turk from Turkey."[16] Though Defendants proffered the deposition testimony of Superintendent Ross wherein he denied making derogatory remarks towards Plaintiff and Muslims, such evidence only raises a material issue of fact. Similarly, it raises a credibility issue which is best resolved by the trier of fact. *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (internal citations omitted) (Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are functions of the jury). Lastly, while it is

---

[15] While it is undisputed that Plaintiff had approximately nineteen (19) personal or sick days during his first two years, Plaintiff proffered evidence that some of the absences were excusable.
[16] On summary judgment, the plaintiff has a de minimus burden to establish a prima facie case of discrimination. *Duprey v. Prudential Ins. Co. of Am.*, 910 F. Supp. 879, 885 (N.D.N.Y. 1996).

undisputed that Plaintiff had approximately nineteen (19) personal or sick days during his first two years, Plaintiff proffered evidence that some of the absences were excusable. Such evidence is sufficient to demonstrate that the reason(s) for not granting tenure was a pretext for discrimination. Plaintiff need only demonstrate that discriminatory invidious was a factor for the adverse employment action. *Price v. Hopkins*, 490 U.S. 228 (1989).

The Court has also considered Defendants' reliance on the same-actor doctrine, as articulated in *Grady v. Affiliated Cent.*, Inc., 130 F.3d 553 (2d Cir. 1997), to suggest a lack of culpability on the part of Superintendent Ross. In *Grady*, the Second Circuit held that there are factors which can strongly suggest that invidious discrimination is unlikely, such as whether the person who made the decision to fire was the same person who made the decision to hire. *Id.* at 560. The Court opined that it is difficult, if not inconsistent, to impute an invidious motivation upon the employer who fires an employee when the employer is the same person who made the decision to hire. *Id.* The Court further stated that to impute such an invidious motivation would be especially difficult when the firing occurs only a short time after the hiring. *Id.* (internal citations omitted). Such circumstances present a strong inference that discrimination was not a determining factor for the adverse action taken by the employer. *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991). In the instant case, Superintendent Ross hired Plaintiff and denied him tenure two years later. While it is true that an interim period of two years has been deemed to warrant the application of the same actor doctrine (see *Campbell v. All. Nat. Inc.*, 107 F. Supp. 2d 234, 248 (S.D.N.Y. 2000)), the doctrine only provides an inference and is not dispositive on the issue of the existence or non-existence of a discriminatory intent. See *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014). Here, the record reveals that Superintendent Ross purportedly made derogatory statements about Muslims and had formal evaluations which are inconsistent with Defendants' contention that Plaintiff was an inadequate teacher.

Defendants, however, demonstrated entitlement to dismissal of Plaintiff's claim concerning the 2014 tenure decision as against Dr. Chase. It is well settled that in order to hold an individual defendant liable under §1983 he or she must be personally involved in the alleged deprivation. *Black v. Coughlin*, 76 F. 3d.

72, 74 (2d Cir. 1996); *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001); *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004). Personal involvement can be proven through evidence that "(1) the defendant participated directly in the constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or a custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference … by failing to act on information indicating that unconstitutional acts were occurring." See *Colon v. Coughlin*, 58 F.3d 865, 873 (2d. Cir. 1995).

Viewing the record in the light most favorable to the Plaintiff, the Court determines that none of the five factors are applicable to Dr. Chase. The record is void of any evidence that Dr. Chase was personally involved in the decision to deny Plaintiff tenure. Though Dr. Chase held the position of Assistant Superintendent, there is no evidence that she held a policy making position. It was not until 2015 that she was promoted to Superintendent.   At the time the decision was made, Dr. Chase was merely a subordinate of Ross. A supervisor cannot be held liable solely for the acts or omissions of her subordinates unless it can be shown that she was personally involved in the alleged deprivation. *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197 (S.D.N.Y. 2013). For liability to attach, there must be a causal link between the supervisor's actions (or inactions) and the alleged harm. *Id.* at 206 (internal citations omitted).

Superintendent Ross purportedly relied on the advice of Principal Washington to deny tenure. According to Washington, he informed Ross that Plaintiff had too many absences and that tenure should  not be given. As previously discussed, Plaintiff suggest that he was denied tenure because Superintendent Ross discriminated against him because he was a Muslim. Though there was testimonial evidence to suggest that Dr. Chase worked "hand-in-glove" with then-Superintendent Ross, there is no evidence that she shared or endorsed Ross' alleged  animus towards Muslims. Even if the Court were to consider Principal Washington's contention that Dr. Chase purportedly failed to object to her bosses' unusual comments or would respond to them by merely saying "[w]e know he's crazy, you know how he is," such evidence is insufficient to support

a showing of discriminatory intent by Dr. Chase. Such evidence also fails to support a finding of personal involvement. Since it has been determined that Dr. Chase was not personally involved, the Court need not determine whether she is entitled to qualified immunity.

**The 2015 Tenure Decision**

The Court now turns to whether Plaintiff can establish an inference of discrimination with respect to his denial of tenure in 2015 which resulted in his termination.

Defendants assert that the record is void of any discriminatory animus regarding Plaintiff's denial of tenure in 2015. Defendants rely on the deposition testimony of Principal Smith and Dr. Chase. Principal Smith stated that he did not recommend to Dr. Chase that Plaintiff be granted tenure because of his poor classroom management skills, his attendance and lack of follow through. Smith conducted approximately six informal observations of Plaintiff. Dr. Chase testified that she relied on Principal Smith's recommendation and her own observation not to recommend Plaintiff for tenure, noting his failure with the robotics team. They argue that the record supports their contention that there were legitimate non-discriminatory reason for denying Plaintiff tenure.

Plaintiff asserts that the 2015 decision to deny tenure was tainted by the alleged discrimination involved in the 2014 decision. Courts have held that an "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision .... even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful process." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 450 (2d Cir. 1999). Mindful that a plaintiff's burden in defeating a motion for summary judgment in a discrimination case is "de minimis" (see *Cronin v. Aetna Life Ins. Co*., 46 F.3d 196, 203–04 (2d Cir. 1995)), the Court determines that there is a material issue of facts whether Plaintiff's denial of tenure in 2015 which resulted in his termination was motivated in part by discriminatory animus. As previously mentioned, at the time of the 2015 decision, Dr. Chase was the Superintendent of GCSD.

**Plaintiff's NYHRL Claims**

Defendants' motion for summary judgment seeking to dismiss Plaintiff's claims asserted under the NYHRL is granted. New York Education Law Section § 3813(1) provides that a claimant asserting a cause of action against a school board or school supervisor must file a notice of claim within three months after the accrual of a claim. Such filing is deemed an absolute condition precedent to the filing of a lawsuit. See *Barchet v. New York City Transit Auth.,* 20 N.Y.2d 1, 6 (1967); *Silvernail v. Enlarged City Sch. Dist. of Middletown*, 40 A.D.3d 1004, 1005 (2007). By letter dated March 11, 2014, written by Principal Washington, and letter dated April 30, 2014, written by Superintendent Ross, Plaintiff received the first notification that he was denied tenure in 2014. By resolution dated June 26, 2014, the School Board voted not to extend tenure to Plaintiff. By letter dated April 13, 2015, written by Dr. Chase and purportedly hand delivered, Plaintiff was informed that he would not be recommended for tenure. By letter dated May 21, 2015, from the GCSD District Clerk, Ivy Kraus, Plaintiff was notified that he was being terminated from his position upon "completion of such probationary period, that being August 30, 2015. Plaintiff's notice of claim is dated April 16, 2016, beyond the three month period required by statute.

State law claims of discrimination under NYHRL asserted against a state entity requires a Plaintiff to comply with notice of claim as set out in N.Y. County Law §52 and N.Y. Gen. Mun. Law § 50-e. See *Russell v. Westchester Cmty. Coll.*, No. 16-CV-1712, 2017 WL 4326545, at *6 (S.D.N.Y. Sept. 27, 2017). Since Plaintiff has failed to demonstrate timely compliance with the notice of claim requirements, the state law claims must be dismissed.[17]

---

[17] A review of the court file reveals Plaintiff never filed a motion seeking to deem the notice of claim timely served.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED in part and GRANTED in part. The Court grants Defendants' motion for summary judgment to the extent of dismissing all of Plaintiff's NYHRL state law claims. Defendants' motion for summary judgment seeking to dismiss Plaintiff's discrimination claims regarding the 2014 denial of tenure is granted as against Dr. Chase and denied as against GCSD. Defendants' motion for summary judgment seeking to dismiss Plaintiff's discrimination claims regarding the denial of tenure in 2015 is denied. Accordingly, the Court respectfully directs the Clerk of the Court to terminate the motion at ECF No. 40.

The parties are directed to appear in court on March 14, 2019 at 11:30 a.m., for a pre-trial conference.

Dated:   February 7, 2019
         White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge